UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.  08 CR 115 |
| v. | ) | |
| | ) | Magistrate Judge Maria Valdez |
| MARK POLCHAN and | ) | |
| SAMUEL VOLPENDESTO | ) | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT  MARK
POLCHAN AND SAMUEL VOLPENDESTO's REQUEST FOR RELEASE ON BOND**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, for the reasons set forth below respectfully requests that this Court deny defendants' MARK POLCHAN and SAMUEL VOLPENDESTO's Request for Release on Bond.

**I.        PROCEDURAL BACKGROUND**

On February 7, 2008, a Grand Jury indicted POLCHAN and VOLPENDESTO, charging them with maliciously damaging, by means of explosive, a building in Berwyn, Illinois (Count Two); with conspiring to do so (Count One); and with carrying a destructive device during and in relation to the crimes of violence set forth in Counts One and Two (Count Three).  POLCHAN and VOLPENDESTO if convicted each face terms of imprisonment of 35 years to life, and fines of up to $750,000.

On July 31, 2008,POLCHAN and VOLPENDESTO appeared for their initial appearances and arraignments.  POLCHAN and VOLPENDESTO at that time requested release on bond.  The Detention Hearing has been scheduled for August 6, 2008.

II.    **ANALYSIS**

As discussed below, the serious charges brought against defendants invoke the rebuttable presumption in favor of detention, and the statutory factors strongly counsel in favor of detaining both defendants (POLCHAN as a risk of flight and a danger to the community, and VOLPENDESTO as a risk of flight).

A.    **PRESUMPTION IN FAVOR OF DETENTION TRIGGERED**

POLCHAN and VOLPENDESTO have been indicted for crimes of violence carrying a *minimum* of 35 years incarceration. Pursuant to 18 U.S.C. § 3142(e) and (f)(1), these serious charges result in a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of defendants and the safety of the community. *See generally United States v. Dominguez,* 783 F.2d 702, 707 (7th Cir. 1986) (discussing, in the context of the rebuttable presumption, "Congressional findings that certain offenders . . . as a group are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions."); *see also United States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991) (reversing decision to release defendant and noting that "[p]retrial detention may be based on dangerousness in addition to, or instead of, the risk of flight.").

POLCHAN and VOLPENDESTO thus bear a limited burden of production to rebut that presumption by coming forward with evidence that they do not pose a danger to the community or a risk of flight. *See Dominguez*, 783 F.2d at 707; *see also United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986) (presumption of risk of flight; "t]he concern underlying the presumption [of risk of flight] applies to the general class of defendants charged with one of the specified

offenses-not merely to defendants who fail to produce rebuttal evidence"). Even if defendants are able to meet his burden of production, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court. *See Martir*, 782 F.2d at 1144.

### B. STATUTORY FOUR-FACTOR ANALYSIS MANDATES INCARCERATION

#### 1. <u>The Nature and Circumstances of the Charged Offenses</u>

The Indictment charges POLCHAN and VOLPENDESTO with being personally responsible for very serious violent crimes. Indeed, the seriousness of the charged offenses is reflected by Congress' decision to require a minimum term of imprisonment of 35 years for the charged conduct, and to create a presumption in favor of detention. *See generally Dominguez,* 783 F.2d at 707. As set forth in more detail below, POLCHAN and VOLPENDESTO, following the orders of the Chicago Outfit,[1] personally participated in the bombing of a video gaming business that failed to follow the Outfit's directions. Moreover, the bomb was placed outside the business on a busy street and was ignited using a long wick (as opposed to a remote detonator), with no attention paid to what physical harm the explosion might cause to residents living nearby, occupants of vehicles driving by, or nearby pedestrians. POLCHAN and VOLPENDESTO, in short, executed a hazardous crime violence, and the "Nature and Circumstances of the Charged Offense" factor thus squarely counsels against release.

---

[1]The history, structure, and operation of the Outfit (also known as "La Cosa Nostra" or "LCN") is described in several reported cases. *See, e.g., United States v. Zizzo*, 120 F.3d 1338 (7th Cir. 1997); *United States v. Rainone*, 32 F.3d 1203 (7th Cir.1994).

-3-

2.    __The Weight of the Evidence Against Defendants__[2]

The government's evidence of defendants' guilt – of which only a fraction is covered herein – is overwhelming.

### *ATF Investigates 2003 Bombing*

On February 25, 2003, ATF agents responded to the area of 6508 West 16th Street, in Berwyn, Illinois, after receiving information that a bomb had blown up in the area. The building found at this location housed several businesses, including C & S Coin Operated Amusements ("C & S"). At the time, C & S was in the business of leasing coin-operated vending and video machines. ATF personnel observed that a bomb had been detonated right in front of C & S. The windows to the storefront of C & S were blown out, and there was extensive damage to the interior of the store.

In the opinion of an ATF Explosives Enforcement Officer ("EEO"), the debris recovered from the scene, including the presence of PVC fragments and perchlorate combustion products, was consistent with an improvised explosive weapon, commonly known as a "pipe bomb." Moreover, in the opinion of the EEO, the absence of electrical components indicated that the device had been detonated through the use of a fuse. The EEO also concluded in his expert opinion that the

---

[2]The weight of the evidence is a factor given the *same* weight as all other factors. *See United States v. Calabrese*, 436 F. Supp.2d 925, 927 n.3 (N.D. Ill. Jun. 19, 2006) (Zagel, J.) ("The statute does not instruct that one or another factor is less important. Moreover, it is difficult to see how this factor could always be less important than the others. Were there very strong evidence that a defendant was a serial rapist or killer, this factor alone might outweigh all other factors in determining whether detention is required to protect the community. The near certainty of conviction and life sentence of an accused would be a very important factor in considering whether the accused would flee, particularly when combined with evidence that the accused had a large bank account in a country that will not extradite to the United States.").

detonation of this device was capable of causing personal injury or death to persons near the explosion.

### *Chicago Outfit Tasked POLCHAN with Bombing; POLCHAN In Turn Recruited Bombing Expert VOLPENDESTO*

The government's investigation has established that C & S was bombed at the orders of the Chicago Outfit.  C & S was in competition with Outfit-run gambling operations.   At the time of the bombing, the Outfit owned and operated gambling machines generating well over $13,000,000.00 in illegal proceeds for the Outfit.[3]

---

[3]For example, in 2007 James (after trial) and Michael (after plea) Marcello were convicted as part of the "Family Secrets" prosecution (02 CR 1050) for their involvement in the Outfit's extensive racketeering and gambling activities, including gambling activities involving M&M Amusements.  *See generally United States v. Calabrese*, 436 F. Supp.2d 925, 926 (N.D.Ill. Jun. 19, 2006) ("The indictment charges Defendant (and many others) with participation in an organized crime conspiracy lasting from the mid-1960's through the present day. The conspirators, as alleged here and reported in decisions of other courts, were in the business of extorting money, operating illegal gambling ventures, making usurious loans, and collecting loans, gambling debts, and other money by threatening and using force. The organization allegedly employed intimidation, bribery, and murder to protect itself against witnesses and turncoats within its ranks. Without question, the allegations portray an organization that threatens the safety of individuals; similarly, the crimes alleged are among the most serious crimes to threaten the safety of the community.").

-5-

***VOLPENDESTO Recorded Discussing the Bombing***

CW4 advised that s/he worked for VOLPENDESTO in a business located in Chicago.[4] According to CW4, s/he (CW4) personally knew VOLPENDESTO associate Kyle Knight. CW4 stated that just before Christmas in 2002, Knight came to VOLPENDESTO's business and left a package for VOLPENDESTO. CW4 inspected the package and noted that it contained black powder and a long green fuse. CW4 stated that VOLPENDESTO said words to the effect of "Oh, good" after CW4 advised him about the package.

CW4 was asked the day after the bombing by POLCHAN whether anyone was able to write down the license plate number from the vehicle used in the bombing. CW4 and POLCHAN at the time were in POLCHAN's business, "Goldberg Jewelers," 1203 South Cicero Avenue, Cicero, Illinois. When CW4 responded that he had no such information, POLCHAN said words to the effect of "that shows you how smart they [law enforcement] are."

CW4 further stated that in or around the summer of 2004 – over a year after the bombing of C & S – CW4 was at VOLPENDESTO's house. VOLPENDESTO asked CW4 how he (VOLPENDESTO) could get a hold of Knight. VOLPENDESTO referred to Knight as the "Chemist." VOLPENDESTO told CW4 that he had something for Knight to do, and that Knight

---

[4]By way of background, CW4 is a career residential and commercial burglar. According to CW4, and as corroborated by informant information and other evidence, s/he has participated in at least 12 residential and commercial burglaries (both within and outside of Illinois) at the direction and/or with POLCHAN's personal participation.

CW4, as well as other cooperating individuals and independent investigation, identify POLCHAN as a ranking member of the criminal Outlaws Motorcycle Club, and a criminal associate of the Chicago Outfit. According to CW4 and other cooperating individuals, POLCHAN uses these connections with the Outlaws and the Outfit, as well as with certain corrupt police officers, to advance his and his associates' criminal objectives.

could make some money. CW4 asked VOLPENDESTO if he (VOLPENDESTO) needed Knight for something like what happened at C & S. CW4 explained that what CW4 meant was: Did VOLPENDESTO need Knight to provide him with explosives or a bomb. VOLPENDESTO replied he did.

On May 17, 2005, CW4 consensually recorded a meeting between himself/herself and VOLPENDESTO. During CW4's meeting with VOLPENDESTO that day, VOLPENDESTO and CW4 drove past the C & S location in Berwyn. CW4 advised that, as they drove past, VOLPENDESTO informed CW4 that "we blew part of that away."[5] When discussing the location of the explosive device, VOLPENDESTO said "I didn't put it in the inside, inside, it was on the outside." CW4 also mentioned to VOLPENDESTO that C & S had been boarded up the next day, and asked VOLPENDESTO whether "part of the store went too?" CW4 advised that s/he was asking VOLPENDESTO whether the building that C & S was located in was damaged as well. VOLPENDESTO confirmed that it had been. VOLPENDESTO commented "Oh yeah, nice job." VOLPENDESTO also explained that it was "Mark" [POLCHAN] who involved VOLPENDESTO in the bombing: "Mark was the original guy that knew what the fuck it was about, you know what I mean?"

During his/her recorded conversation with VOLPENDESTO, CW4 told VOLPENDESTO that law enforcement believed a van had been seen leaving the scene at the time of the explosion.

_____

[5]The transcriptions contained herein are in draft, and not final, form. Moreover, the interpretations of the recorded statements, opinions about what is being discussed and who is being referred to, as well as supplemental factual information, are included in bold inside brackets ("[ ]"). These interpretations and opinions are based on the context of the conversations; patterns of references detected over the course of the investigation; comparisons of topics discussed with objectively known facts, where provable; and inferences drawn from facts established elsewhere during the course of the investigation.

VOLPENDESTO responded "that's not what *we* had," and added "*we* laughed the next day when we found out that they were saying it was a van" (emphasis added).

VOLPENDESTO further explained to CW4 that he had used a "long wick" that "went through the thing to both sides and came together like this, you light both of them in the event one don't work you got at least a chance the other one will work. . . . I've *done some* with four of them which is actually 2 wicks." (Emphasis added).  Clearly, this was not VOLPENDESTO's first bombing.

VOLPENDESTO, however, was not entirely pleased at the money he had received to complete this bombing.  According to VOLPENDESTO, "Goldberg [POLCHAN] made money [from the bombing], I made shit."  During the conversation, VOLPENDESTO also mentions asking POLCHAN whether he (POLCHAN) had every seen Al Capone's grave.   According to VOLPENDESTO, POLCHAN replied "He says that I wanna go to Mount Carmel [cemetery] because I put a couple of guys in there."

VOLPENDESTO also discusses the "Large Guy" or "Large" (Outfit Member A) and his gambling operations.  VOLPENDESTO noted that "the Large guy's boss was [the Outfit's boss] Johnny Apes [Monteleone]."  According to VOLPENDESTO, "Large" "got good guys running the fucking place [believed to be Cicero, Illinois]."   CW4 comments to VOLPENDESTO "Well, you were fair, you used to tell me that you were fair with the Large guy [Outfit Member A].  You, you used to give him money but then when he took over he never gave you shit" VOLPENDESTO responded "[t]hat's right," to which CW4 said "[w]ell, that ain't fair."  VOLPENDESTO agreed, but clarified that he was not part of Outfit Member A's crew: "No, well, I ain't got nothing to do with the Large Guy, the Large Guy ain't got me cut in on any fucking thing."  CW4 commented

"[s]o he just calls you when he fuckin' needs you to do his dirty fuckin laundry for him."
VOLPENDESTO agreed, saying "[t]here you go." VOLPENDESTO during the conversation also
commented that he advised Outfit Member A to not drive a Cadillac because it drew unnecessary
law enforcement attention: "Naw, that, that's where [Outfit Member A is] making a mistake. See,
G-Men are human beings."

### *Recorded Conversation Between CW4 and Kyle Knight Concerning the Bombing*

CW4 further advised that on April 9, 2005, s/he consensually recorded a meeting between
CW4 and Kyle Knight. The meeting occurred near a Portillo's hot dog stand, located at Harlem
and Archer Avenue in Chicago.

During the recorded conversation, Knight and CW4 discussed various explosives, including
TNT, C4 and RDX. Knight explained to CW4 how powerful certain explosives were as well.
During the recording, CW4 mentioned to Knight that "Sam" [VOLPENDESTO] had taken "that
thing over by . . . C & S whatever the fuck it was." CW4 stated that s/he was referring to the bomb
that had gone off at C & S. When Knight responded: "that was one pound," and also said "I
thought he put it in a pipe, didn't he?," CW4 stated that s/he understood that Knight was referring
to the explosive device VOLPENDESTO had used to bomb C & S, and that Knight was saying he
had given VOLPENDESTO one pound of explosives for use in a pipe bomb.

During his/her recorded conversation with Knight, CW4 asked Knight "you left me a bag
of something right," and Knight responded "yeah," before CW4 continued on to say "for Sammy"
[VOLPENDESTO]. CW4 advised that s/he was asking Knight whether Knight had left a bag of
explosives to give to VOLPENDESTO, and CW4 understood Knight to be confirming that he had
done that.

-9-

During the recorded conversation, Knight told CW4 that "Sammy [VOLPENDESTO] had told me everything about the person he was going to blow up." When Knight explained during the recorded conversation that he (Knight) provided "15 minutes worth of fuse," and that "he would have got 30 years if he would've got caught," CW4 understood Knight to be saying that he had given VOLPENDESTO enough fuse with the explosives so that it would take 15 minutes to burn. CW4 also understood Knight to be saying that VOLPENDESTO would have faced a 30 year prison sentence if he was caught setting off a bomb.

During the recorded conversation, when CW4 mentioned to Knight that the "place" was "poker machines and stuff," CW4 stated s/he was referring to C & S. Knight responded: "He [POLCHAN] told me about that, it had to do with the [gaming] machines." During the recorded conversation, Knight told CW4: "I gave him [VOLPENDESTO] two bags [of explosives], said mix them together, dump them in a pipe and off to the races you go." During the recorded conversation, Knight said he was told that he [VOLPENDESTO] "was going to do it inside, which would have meant the building would have absorbed all the shrapnel." CW4 stated that s/he understood Knight to be saying that Knight thought that VOLPENDESTO was going to set off the pipe bomb inside the building. Knight expressed anger that VOLPENDESTO set off the bomb outside instead, and noted that this creates a great danger to neighbors and passers-by. Knight told CW4 during the recorded conversation that he (Knight) could see someone "doing it [the bombing]" for "20 grand," but not for "a grand."

### POLCHAN's "Hush Money" Payments to CW4

The government's investigation has revealed that, starting in mid-July, 2007 (a few days after Knight was charged with the bombing of C & S), POLCHAN sent "hush money" payments

-10-

to CW4 at a correctional facility.  The last such envelope containing money, as well as bogus sender and return address information, was date-stamped June 12, 2008.

### Evidence of POLCHAN and VOLPENDESTO's Guilt

As discussed in summary form above, the evidence that POLCHAN and VOLPENDESTO are guilty of the charged bombing-related offenses is strong.  This fact, which gives both men an even greater incentive to flee, also counsels in favor of continued detention.  *See generally Calabrese*, 436 F. Supp.2d at 927 n.3 (discussing motivation for flight when defendant is facing long sentence combined with strong evidence).

**3.**    **POLCHAN and VOLPENDESTO's Backgrounds and Personal Characteristics**

POLCHAN and VOLPENDESTO have long-standing ties to organized crime.  POLCHAN is a ranking member of the Outlaws Motorcycle Club,[6] as well as a trusted associate of the Chicago Outfit.  Corroborating POLCHAN's criminal association with the Outfit and Outfit Member A, CW4, a confidential witness who engaged in various criminal activities at POLCHAN's direction, was frequently told by POLCHAN that he (POLCHAN) had to pay a portion of his illegal proceeds ("street tax") to Outfit Member A (Outfit Member A has previous convictions for his involvement in organized-crime related collections of "street tax").   On July 29, 2008, Outfit Member A was observed by an undercover officer meeting with POLCHAN at Goldberg's Jewelers.

---

[6]The history, geographic reach, and criminal activities of the Outlaws Motorcycle Club is described in *Piscottano v. Murphy*, 511 F.3d 247, 253-55, 274-76 (2d Cir.  2007) ("Outlaws in various parts of the country have engaged in violent criminal activity, including rape, arson, bombings, and murder, and numerous convictions and imprisonments of Outlaws members. . . . The fact that law enforcement agencies believe the Outlaws and many of its chapters engage in criminal activity is sufficient in itself to make the nature of those entities a matter of public concern.").

VOLPENDESTO similarly has a long-standing working relationship with the Outfit that he himself has discussed in a recorded conversation. Such extensive criminal ties with powerful criminal organizations,[7] combined with their other background information, render POLCHAN and VOLPENDESTO particularly unsuited for release on bond.

### POLCHAN Background and Characteristics

Between June 1984 and February 1996, POLCHAN was arrested approximately 14 times for offenses including Burglary, Possession of Burglary Tools, Assault, Battery and Possession of a Firearm. POLCHAN has two convictions: Following a June 29, 1986, arrest for Battery and Resisting a Peace Officer, POLCHAN was convicted on the charge of Resisting a Peace Officer, and on August 19, 1986, POLCHAN was sentenced to one year imprisonment; and following a June 22, 1985, arrest for Carry or Possessing a Firearm, Violation of FOID Cards, Soliciting a Prostitute, and Impersonating a Peace Officer, judgment was withheld on the charges of Violation of FOID Cards, Soliciting a Prostitute and Criminal Damage to Property. On August 11, 1986, POLCHAN was sentenced to Supervision and a $500 fine.

The above criminal history of course vastly under-states POLCHAN's true lawless and violent background. Multiple cooperating witnesses, physical surveillance, consensually-monitored conversations, and other evidence gathered during the investigation show POLCHAN to have been personally involved in, among other crimes, large-scale theft from interstate and foreign shipments and receipt and possession of such stolen goods, in violation of 18 U.S.C. § 659; Outfit-related

---

[7]The evidence elicited during the Family Secrets trial, for example, revealed numerous instances of Outfit members and associates (including Joseph "The Clown" Lombardo, Frank "The German" Schweihs, and Frank Calabrese, Sr.) fleeing during the investigation or prosecution of Outfit-related cases.

extortion and making of loans at usurious interest rates (extending "juice loans"), in violation of 18 U.S.C. § 891 & 894; interference with interstate commerce by threats or violence, in violation of 18 U.S.C. § 1951; involvement in illegal Outfit-related gambling business, in violation of 18 U.S.C. § 1955; transportation of stolen goods, in violation of 18 U.S.C. § 2314; receipt, possession, sale, distribution, or purchase of contraband cigarettes, in violation of 18 U.S.C. § 2342(a); sale or receipt of stolen goods, in violation of 18 U.S.C. § 2315; conducting the affairs of an enterprise affecting interstate commerce through a pattern of racketeering consisting of the above described offenses, felony robbery and syndicated gambling in violation of Illinois law, and collection of an unlawful debt and a conspiracy to do so, in violation of 18 U.S.C. §§ 1962(c) and (d) and 1963; and conspiracy to commit offenses against the United States, in violation of  18 U.S.C. § 371.

Providing a glimpse of POLCHAN's criminal activities, multiple cooperating witnesses have provided detailed and corroborated information about their long-standing criminal relationships with POLCHAN.  In summary, the investigation to date has established POLCHAN and his confederates participation in dozens of residential and commercial burglaries netting hundreds of thousands of dollars in stolen jewelry and merchandise.  Some of these crimes were committed with firearms; in one of the armed robberies of a jewelry store an employee was shot, and in one residential burglary the home-owner was stabbed.  Disturbingly, the investigation has revealed that POLCHAN used his connections not only the Outlaws and the Outfit, but also with various corrupt police officers, to advance his and his associates' criminal objectives.

*POLCHAN's Unwillingness to Serve Extended Prison Sentence*

In addition, beginning on or about June 6, 2007, an undercover agent ("UCA") developed a relationship with POLCHAN. The UCA used the ruse that the UCA had items to sell that might interest POLCHAN. The nature of the merchandise offered for sale by the UCA suggested it was stolen. Specifically, the UCA offered to sell POLCHAN gold crowns, and some of them were still affixed to human teeth.

Thereafter the UCA purchased various items that law enforcement believes were unlawfully obtained. During some of these meetings, POLCHAN expressed his concern about being detected by law enforcement. For example, on February 22, 2008, POLCHAN told the UCA he "was being watched."[8] On March 21, 2008, at the Ontourage nightclub, POLCHAN similarly told the UCA that he (POLCHAN) had "about two months left on the streets before he goes to jail." POLCHAN said that everyone he "grew up with" had "ratted him out." POLCHAN further stated that he was "willing to do 15 to 20 years," and that "people around [him] are dropping like flies." In this case POLCHAN's minimum sentence is 35 years, so by his own analysis this sentence exceeds what POLCHAN, a man with no legitimate source of income, is "willing to do."[9]

_____

[8]The quotes in this paragraph represent the UCA's best efforts to recollect what had been said. The UCA provided these quotes to federal agents shortly after engaging in the conversation.

[9]The government also notes that the investigation to date has demonstrated that the majority of POLCHAN's income is illegally-derived. Moreover, because POLCHAN's Justice, Illinois, residence was used to further the criminal enterprise (the residence used to conduct meetings, disburse illegally-obtained proceeds, store stolen jewelry and merchandise, etc.) the government anticipates seizing it.

*VOLPENDESTO's Background and Characteristics*

VOLPENDESTO was arrested on or about February 20, 1976 for deceptive practices. This charge was dismissed on or about March 5, 1976. VOLPENDESTO was arrested on or about September 12, 1983 for battery. This charge was dismissed on or about November 1, 1983. VOLPENDESTO was arrested on or about July 3, 1986, for battery. The charge was dismissed on or about October 21, 1986. VOLPENDESTO was arrested on or about January 25, 2006 for battery and domestic battery. On or about May 18, 2006, the charge was dismissed.

These charges of course do not reflect VOLPENDESTO's long-standing and admitted criminal association with the Outfit and his history of burglaries. VOLPENDESTO, as discussed immediately below, has not let age slow him down when it comes to crime.

4. **Danger to the Community**

*POLCHAN Poses Danger to the Community*

The above-described evidence establishes that POLCHAN is a violent ranking member of the criminal Outlaws Motorcycle Club who by his own reckoning is unable to spend more than 20 years in jail (he is facing a minimum of 35 years here, and the evidence against him is strong). Not only is POLCHAN accountable for dozens of residential and commercial robberies and burglaries, some of which resulted in innocent citizens being shot and stabbed, but POLCHAN also has access to a network of corrupt law enforcement officers.

On July 30, 2008, federal agents executed various search warrants in Chicagoland. During the search of POLCHAN's Cicero business, "Goldberg's Jewelers" agents seized various items and documents, many of which are still being analyzed. One of the documents recovered was a letter in which the writer is seeking information about a "stool pigeon" [cooperator]. The writer says "we

are trying to find out whoever else [REDACTED] told on besides me . . . ." The writer also asks "Mark" [POLCHAN] to "find out some information in which he may of told on other people." Along with the letter the writer include a picture of the "stool pigeon" standing together with a woman.

In a separate letter recovered from POLCHAN's business, an incarcerated individual to provides "Mark" [POLCHAN] with an unsigned affidavit in another person's name. The writer says he (the writer) hopes the "kid is still around" and asks POLCHAN to "see what you could do for me and maybe you could take him ["the kid"] next door while you are at it [beat the "kid" up]." The writer also refers to "the kid" as "this pig," and in the unsigned affidavit seeks to have the "kid" retract testimony he gave in a criminal case.

POLCHAN and/or his associates were apparently effective in "persuading" the "kid" to change his testimony. A Westlaw search revealed that the individual, along with three other individuals, was a chance eyewitness to the Cicero, Illinois, shotgun execution committed by the writer and his co-defendant. The "kid" did in fact subsequently via affidavit recant his original trial testimony. However, the State introduced evidence that the "kid" was "coerced" into signing the affidavit, and that another witness was similarly forced by "threat" into signing a false recantation of that witness' testimony.     It is certainly reasonable to infer that POLCHAN and/or his criminal associates were behind this obstruction of justice in a murder case.

But one need not rely solely on recordings, corroborated CW information, and seized items to conclude that POLCHAN is a career criminal who presents a grave danger to the public, as well as a serious risk of flight, if released. In POLCHAN's case his loyalty to a criminal lifestyle indeed is skin-deep. *See* Government Exhibit A ("Outlaws Chicago" tattoos on POLCHAN'S right

forearm); Government Exhibit B ("GFOD" tattoo on POLCHAN's left arm, meaning "God Forgives, Outlaws Don't"); Government Exhibit C ("1%er" tattoo on POLCHAN's left forearm, indicating that POLCHAN is among the "1 percent" of bikers who live the criminal "lifestyle," *see generally United States v. Starrett*, 55 F.3d 1525, 1533 (11th Cir. 1995). In addition, recovered from POLCHAN's person incident to his arrest was a knife, *see* Government Exhibit D, as well as various Outlaws jewelry, including POLCHAN's "1%er" ring, his Outlaws "Brotherhood" ring featuring two revolvers, his "G.F.O.D." ring, and his Outlaws "patched" vest. *See* Exhibits E-1, E-2, and E-3. These items speak clearly to POLCHAN's strong affiliation to the Outlaws' lawless lifestyle, and to the related probability that POLCHAN will not respect this Court's orders and will not comply with the dictates of the law.

Moreover, from POLCHAN's business, agents recovered a switchblade, *see* Exhibit F, two large knives located near the counter, *see* Exhibits G and H, a machete located in the business' office, *see* Exhibit I, and an illegal stun gun. Also seized from POLCHAN's safe were various local law enforcement badges, *see, e.g.*, Exhibit J-1. Also recovered from POLCHAN's business was a bulletproof vest. *See* Exhibits J-2 and J-3. A reasonable implication from POLCHAN's unauthorized possession of these badges is that POLCHAN has attempted, and/or planned to attempt, the impersonation of a police officer in order to further some criminal activity.

Agents from the ATF further recovered various items from POLCHAN's Chicago Outlaws Clubhouse ("Northside Clubhouse"), where he was a ranking member, *see* Exhibit K-1 and K-2 ("Northside Crew" belt recovered from POLCHAN). One of the items recovered was a live hand

grenade.[10]  *See* Exhibit K-3 and K-4.  The obvious implication from these seizures of evidence is

that POLCHAN does not shy away from violent confrontation in order to get his way.[11]

### VOLPENDESTO Poses a Danger to the Community

While VOLPENDESTO is of course considerably older than POLCHAN, is less physically

imposing, and has not exhibited the same level of leadership within a criminal enterprise,

VOLPENDESTO by his own taped admission has engaged in bombings prior to the one charged.

Moreover, it was VOLPENDESTO, ignoring the advice of his co-conspirator Knight, who a mere

five years ago placed a bomb in a public area where innocent by-standers could have been maimed

or killed, and who only three years ago was bragging about this crime.

But VOLPENDESTO's criminal activities were not limited to bombings.  On May 21, 1990,

for example, 66-year-old VOLPENDESTO was running a strip club and house of prostitution in

Cicero, Illinois, called the "2105 Club," when he and three other men identified an employee who

they believed may be "talking" to the FBI.  VOLPENDESTO, armed with a handgun and flanked

by two criminal associates, confronted the victim.  VOLPENDESTO then handed a baseball bat

to one of his criminal associates, and the men proceeded to severely beat the victim.  The

VOLPENDESTO-ordered beating was so fierce that the victim slipped into semi-consciousness and

suffered very severe cuts and a broken left elbow.  During the search of VOLPENDESTO's strip

club, agents recovered 22 hand grenades and explosive devices, as well as the baseball bat, hidden

in a trailer next to the building.   United States Magistrate Judge Rosemond ordered

---

[10]The FBI bomb technician who examined the grenade advised that the grenade was most
likely purchased as a hollowed out grenade, and subsequently modified by loading live blasting
caps into the grenade, thus making it (1) live, and (2) illegal.

[11]In fact, POLCHAN has recently been the subject of a civil suit alleging battery.

VOLPENDESTO held without bond on federal charges because he found VOLPENDESTO to pose a danger to the community.[12]   VOLPENDESTO, moreover, was arrested as recently as 2006 for assaulting his wife, and a mere 5 years ago set off a bomb that could have very easily killed or maimed innocent individuals.  Despite his age, VOLPENDESTO is certainly capable of engaging in violent criminal conduct if he believes it will result in the government's case being weakened or his flight being guaranteed.  Moreover, VOLPENDESTO's oddly dissonant sunny and jovial in-court demeanor at his initial appearance indicates that he does not take the present charges seriously.

### *Organized Crime Wishes POLCHAN and VOLPENDESTO Would Disappear*

What drastically distinguishes POLCHAN and VOLPENDESTO from the "average" criminals with long-standing, and serious, criminal backgrounds seeking release on bond are POLCHAN and VOLPENDESTO'S established criminal affiliations with the Chicago Outfit and the Outlaws Motorcycle Club.  These are two powerful and well-funded criminal enterprises with international reach and with well-known histories of using violence, obstruction of justice, intimidation, and even murder to subvert the legal process and to silence those who threaten the enterprises.[13]  Most significantly, these organizations also have a very real and direct interest in the outcome of this particular prosecution.   While part of this motivation may be driven out of a sense of "loyalty" to POLCHAN and VOLPENDESTO, part of it may be driven out of a belief that

---

[12]The AUSA handling the matter confirmed that the federal case against VOLPENDESTO was subsequently dismissed.

[13]The evidence presented during the Family Secrets trial, for example, revealed that almost all of the charged murders occurred because the Outfit believed (often incorrectly) that certain individuals were cooperating – or might cooperate – with law enforcement.

POLCHAN and VOLPENDESTO's mistakes have allowed the government to collect significant evidence against various members of the respective organizations and a concern over the additional law enforcement attention and preparation leading up to the trial.

Moreover, the Outfit and the Outlaws are undoubtedly motivated to assist (through either violent or non-violent means) POLCHAN and VOLPENDESTO in ensuring the silence of the various cooperating individuals who to date have provided information to law enforcement. Indeed, as the letters recovered from POLCHAN's business starkly reveal, POLCHAN's own incarcerated associates at one time used POLCHAN to attempt to obstruct justice on the "outside." Being released on bond will no doubt make it easier for POLCHAN and VOLPENDESTO to assist the Outfit and the Outlaws in pursuit of this goal. In light of POLCHAN and VOLPENDESTO's histories of violence, and the histories of violence associated with the Chicago Outfit and the Outlaws Motorcycle Club, POLCHAN and VOLPENDESTO's release would present an increased threat to those individuals who have cooperated against them.

### III.   **CONCLUSION**

POLCHAN and VOLPENDESTO thus not only have 35 years worth of motivation to flee the jurisdiction, but they also have the means to do so. Indeed, given POLCHAN and VOLPENDESTO's involvement in Outfit and Outlaws-related criminality, and their connections with ranking Outfit and Outlaws members, these criminal organizations *themselves* have a considerable incentive to ensure that POLCHAN and VOLPENDESTO do not appear for trial. Both defendants therefore pose extreme risks of non-appearance.

In light of these circumstances, and remaining mindful of the presumption of innocence, it is the government's view that there are no conditions or combinations of conditions which can

overcome the presumption in favor of POLCHAN and VOLPENDESTO's continued pre-trial detention (in POLCHAN's case because of his risk of flight and danger to the community; in VOLPENDESTO'S case because of his risk of flight).  Based on the foregoing, the government respectfully requests this Court, pursuant to 18 U.S.C. § 3142(e), order defendants detained pending their trials.

                                                  Respectfully submitted.

                                                  PATRICK J. FITZGERALD
                                                  United States Attorney for the Northern
                                                  District of Illinois

By:    s/ T. Markus Funk
                                                T. MARKUS FUNK
                                              AMARJEET S. BHACHU
                                              Assistant United States Attorneys
                                              312-886-7635
                                              Chicago, Illinois 60604

## <u>CERTIFICATE OF SERVICE</u>

Amarjeet S. Bhachu, an Assistant United States Attorney assigned to the instant matter, hereby certifies that teh GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT MARK POLCHAN AND SAMUEL VOLPENDESTO's REQUEST FOR RELEASE ON BOND was served on August 5, 2008, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Amarjeet S. Bhachu
Amarjeet S. Bhachu
Assistant United States Attorney