UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.    08 CR 115 |
| | ) | Hon.   Ronald A. Guzman |
| MARK POLCHAN and | ) | |
| SAMUEL VOLPENDESTO | ) | |

## GOVERNMENT'S MOTION SEEKING DISQUALIFICATION OF DEFENSE COUNSEL DUE TO CONFLICTS PRESENTED BY <u>THEIR REPRESENTATION OF THE DEFENDANTS</u>

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby moves this Court to disqualify Alexander Salerno and Edmund Wanderling from ongoing participation in the pending case, due to actual and potential conflicts resulting from their representation of the defendants. In support of this motion, the government respectfully represents as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      Mark Polchan is represented in this case by attorney Alexander Salerno, and Samuel Volpendesto is represented by Edmund Wanderling. Both attorneys should be disqualified because of the conflicts they currently face and because of the conflicts they will likely face as this case progresses. Both attorneys have previously represented a confidential witness that the government expects to call as a witness at trial. That confidential witness will not waive any conflict arising from his prior representation by Salerno and Wanderling. Furthermore, in addition to representing a government witness, Salerno has also represented Volpendesto in the current case pre-indictment, and therefore is unable to provide conflict-

free assistance to Polchan going forward.  Indeed, Salerno likely cannot proceed forward without also violating his duty of loyalty and confidentiality to Volpendesto as well.  Finally, as detailed herein, both attorneys have maintained legal and/or business relationships with Outfit Member A.  Both Polchan and Volpendesto need impartial advice about their options going forward, including any decision to cooperate against Outfit Member A – and Salerno and Wanderling are in no position to give that advice because of their relationships with Outfit Member A.  Criminal trials must be "conducted within the ethical standards of the profession," and must "appear fair to all who observe them."  *Wheat v. United States*, 486 U.S. 153, 160 (1988).  The government submits this Court should exercise its "substantial latitude" in this area, *Wheat*, 486 U.S. at 163, and disqualify Salerno and Wanderling from further participation in this case.

## **BACKGROUND**

2.     On February 7, 2008, a grand jury sitting in this district returned a three-count indictment against the defendants, charging them with maliciously damaging, by means of explosive, a building in Berwyn, Illinois, which housed a business, C & S Coin Operated Amusements ("C & S") (Count Two); with conspiring to do so (Count One); and with carrying a destructive device during and in relation to the crimes of violence set forth in Counts One and Two (Count Three). Each defendant faces a term of imprisonment of 35 years to life, and a fine of up to $750,000 if convicted.

*Summary of CW4's Testimony*

3.     If this matter proceeds to trial, the government intends to call a cooperating witness ("CW4") who is expected to provide testimony that is central to the government's case.  CW4 has extensive personal knowledge concerning the criminal activities of both defendants.   Moreover, CW4 recorded conversations with defendant Samuel Volpendesto and Kyle Knight that implicate Polchan, Volpendesto and Knight in the bombing of C & S.

4.     For example, CW4 advised that he worked for Volpendesto at a business located in Chicago.  According to CW4, he (CW4) personally knew Volpendesto associate Kyle Knight.  CW4 stated that just before Christmas in 2002, Knight came to Volpendesto's business and left a package for Volpendesto.  CW4 inspected the package and noted that it contained black powder and a long green fuse.  CW4 stated that Volpendesto said words to the effect of "Oh, good" after CW4 advised him about the package.

5.     CW4 was asked the day after the bombing by Polchan whether CW4 knew if anyone was able to write down the license plate number from the vehicle used in the bombing.  CW4 and Polchan at the time were in Polchan's business, "Goldberg Jewelers," 1203 South Cicero Avenue, Cicero, Illinois.  When CW4 responded that he had no such information, Polchan said words to the effect of "that shows you how smart they [law enforcement] are."

6.     CW4 further stated that in or around the summer of 2004 – over a year after the bombing of C & S – CW4 was at Volpendesto's residence.  Volpendesto asked CW4 how he (Volpendesto) could get a hold of Knight.  Volpendesto referred to Knight as the

3

"Chemist." Volpendesto told CW4 that he had something for Knight to do, and that Knight could make some money. CW4 asked Volpendesto if he (Volpendesto) needed Knight for something like what happened at C & S. CW4 explained that what CW4 meant was: Did Volpendesto need Knight to provide him with explosives or a bomb. Volpendesto replied he did.

7.     On May 17, 2005, CW4 consensually recorded a meeting between himself and Volpendesto. During CW4's meeting with Volpendesto that day, Volpendesto and CW4 drove past the C & S location in Berwyn. On the recording, Volpendesto could be heard telling CW4 that "we blew part of that away."[1] When discussing the location of the explosive device, Volpendesto said "I didn't put it in the inside, inside, it was on the outside." CW4 also mentioned to Volpendesto that C & S had been boarded up the next day, and asked Volpendesto whether "part of the store went too?" CW4 advised that he was asking Volpendesto whether the building that C & S was located in was damaged as well. Volpendesto confirmed that it had been. Volpendesto can be heard commenting "Oh yeah, nice job." Volpendesto also explained that it was "Mark" [Polchan] who involved Volpendesto in the bombing: "Mark was the original guy that knew what the fuck it was about, you know what I mean?"

---

[1]     The transcriptions contained herein are in draft, and not final, form. Moreover, the interpretations of the recorded statements, opinions about what is being discussed and who is being referred to, as well as supplemental factual information, are included in bold inside brackets ("[ ]"). These interpretations and opinions are based on the context of the conversations; patterns of references detected over the course of the investigation; comparisons of topics discussed with objectively known facts, where provable; and inferences drawn from facts established elsewhere during the course of the investigation.

8.    During his recorded conversation with Volpendesto, CW4 told Volpendesto that law enforcement believed a van had been seen leaving the scene at the time of the explosion.  Volpendesto responded  "that's not what *we* had," and added "*we* laughed the next day when we found out that they were saying it was a van" (emphasis added).

9.    Volpendesto further explained to CW4 that he had used a "long wick" that "went through the thing to both sides and came together like this, you light both of them in the event one don't work you got at least a chance the other one will work. . . . I've done some with four of them which is actually 2 wicks."

10.    Volpendesto, however, was not pleased at the money he had received to complete this bombing.  According to Volpendesto, "Goldberg [Polchan] made money [from the bombing], I made shit."

11.    Volpendesto also discussed the "Large Guy" or "Large" (hereinafter referred to as "Outfit Member A") and Outfit Member A's gambling operations. Volpendesto noted that "the Large guy's boss was [the Outfit's boss] Johnny Apes [Monteleone]." According to Volpendesto, "Large" "got good guys running the fucking place [believed to be Cicero, Illinois]."  CW4 commented to Volpendesto "Well, you were fair, you used to tell me that you were fair with the Large guy [Outfit Member A].  You, you used to give him money but then when he took over he never gave you shit"  Volpendesto responded "[t]hat's right," to which CW4 said "[w]ell, that ain't fair."  Volpedensto agreed, but clarified that he [Volpendesto] was not part of Outfit Member A's crew: "No, well, I ain't got nothing to do with the Large Guy, the Large Guy ain't got me cut in on any fucking thing."  CW4

commented "[s]o he just calls you when he fuckin' needs you to do his dirty fuckin laundry for him."  Volpendesto agreed, saying "[t]here you go."

*Salerno and Wanderling Previously Represented CW4,*
*Who Is Expected to Testify in this Case*

12.    Defense attorneys Alexander Salerno and Edmund Wanderling have previously represented CW4 in connection with state criminal charges.  Additionally, the government anticipates bringing additional charges in this case against both Mark Polchan and Samuel Volpendesto that will encompass the offense conduct that was the subject of Salerno's prior representation of CW4.  CW4 is expected to testify at trial concerning this offense conduct.  It is also expected that CW4 will be subjected to cross-examination concerning his prior criminal history.

13.    Current defense counsel for CW4 has advised the government that CW4 will not waive any conflict that arises from Salerno's and Wanderling's successive representation of other parties in this case.

*Salerno Represented Volpendesto in the Instant Case Pre-Indictment*

14.    Salerno represented defendant Samuel Volpendesto in connection with the current charges prior to his indictment.  Specifically, in a letter to government counsel dated September 27, 2007, generated as a result of this investigation, Salerno indicated that he had consulted with Volpendesto, and further indicated that all contacts directed to Volpendesto should go through Salerno's office.  Salerno further agreed to accept service of subpoenas for Volpendesto going forward.  Thereafter, on October 4, 2007, an attorney for

the government addressed a subsequent letter to Salerno in his capacity as an attorney for Volpendesto.

*Salerno Represented Outfit Member A*
*During the Course of a Search on July 30, 2008*

15.    As a part of the government's ongoing investigation in this case, on July 30, 2008, federal agents executed a search warrant for the residence of Outfit Member A. Salerno appeared at the residence, and acted in a representative capacity for Outfit Member A.  Specifically, Salerno arrived at Outfit Member A's residence shortly after the search began, and remained there during the course of the search.  Furthermore, Salerno examined the inventory prepared by law enforcement agents after the search was completed.  Outfit Member A, in the presence of law enforcement agents, also consulted Salerno for legal advice while agents were at the house.

*Having Represented CW4, Volpendesto and Outfit Member A,*
*Salerno Now is Attempting to Represent Polchan, Who Has Information*
*Concerning the Criminal Acts of Volpendesto and Outfit Member A*

16.    The government's investigation has established that C & S was bombed by Polchan and Volpendesto at the direction of the Chicago Outfit.  The government's investigation has further established that Outfit Member A was a frequent guest at defendant Mark Polchan's business, Goldberg Jewelers.  Indeed, as recently as July 29, 2008, Outfit Member A was observed by an undercover agent meeting with Polchan at Goldberg Jewelers. The government's investigation has also established that Polchan has information concerning the criminal activities of both Volpendesto and Outfit Member A.

17.    On July 30, 2008, Polchan and Volpendesto were arrested.  Salerno appeared for both Volpendesto and Polchan the next day at their initial appearance.  The government advised Magistrate Judge Cox on that day that it believed Salerno had a conflict of interest, and that it would be raising the matter with this Court.

18.    Thereafter, on August 6, 2008, Magistrate Judge Maria Valdez held a detention hearing for the defendants.  Salerno appeared on behalf of Mark Polchan, and attorney Edmund Wanderling appeared on behalf of Samuel Volpendesto.

*Wanderling's Legal and Business Associations with Outfit Member A and Others*

19.    On January 5, 2004, Outfit Member A advised federal law enforcement agents who served him with an inventory pursuant to Title III of the Safe Streets Act of 1968 that he [Outfit Member A] was represented by Alexander Salerno and/or Edmund Wanderling.

20.    Public records also indicate a business relationship between Wanderling and other parties of interest.  According to these records, Wanderling was the registered agent for at least three businesses for which Outfit Member A was a named officer, and was also the registered agent for defendant Polchan's front business, Goldberg Jewelers.[2]

21.    Wanderling currently represents Nicholas Ferriola, a defendant in *United States v. Calabrese et al.,* 02 CR 1050 (Zagel, J.) (commonly known as the "Family Secrets" prosecution).  Outfit associate Ferriola was charged on March 8, 2007, in a third

---

[2]    The government's investigation has established that Polchan conducted a variety of criminal activities within Goldberg Jewelers, including the storage and disposition of stolen merchandise.

8

superseding indictment with a violation of the Racketeer Influenced Corrupt Organizations Act pursuant to the provisions of 18 U.S.C. § 1962(d), among other violations. On June 18, 2007, Ferriola pleaded guilty to Outfit-related racketeering, Outfit-related extortion and Outfit-operated illegal gambling. Ferriola is awaiting sentencing.

22.    Joseph Venezia is another defendant who was convicted in the Family Secrets prosecution, and has been tied to Outfit-owned establishments. For example, Venezia signed a seven-year lease for the Show Room Lounge, and was listed as the president and secretary of this business. *See United States v. Calabrese*, No. 02 CR 1050 (Zagel, J.) [Docket # 889, Exhibits A-D]. Wanderling was the registered agent for the Show Room Lounge. Court-authorized interceptions confirmed that The Show Room Lounge was run by Chicago Outfit boss James Marcello and his brother, Outfit associate Michael Marcello.

23.    On June 14, 2007, in the *Calabrese* case, Michael Marcello entered pleas of guilty to all counts of that third superseding indictment in which he was charged, namely: Conspiring to conduct the affairs of an enterprise, that is, a criminal organization also known as "the Chicago Outfit," through a pattern of racketeering and through the collection of unlawful debt, in violation of Title 18, United States Code, Section 1962(d)(Count One); conducting an illegal gambling business through the use of video gambling devices, in violation of Title 18, United States Code, Section 1955 (Count Two); paying Nicholas Calabrese a monthly sum of money to prevent and discourage his cooperation with law enforcement authorities, in violation of Title 18, United States Code, Section 1510 (Count Three); and conspiring to conceal income derived in part from illegal gambling from the Internal Revenue Service in order to prevent its ability to compute and collect taxes on that

income, in violation of Title 18, United States Code, Section 371 (Count Eight).  In his plea agreement, Michael Marcello specifically admitted that he was employed by and associated with a criminal enterprise known as "the Outfit," and that he agreed to commit criminal acts on its behalf that constituted federal and state felony violations, including conducting an illegal gambling business, and obstructing justice through the payments of money to prospective witnesses for their silence.  *United States v. Calabrese*, No. 02 CR 1050 (Zagel, J.) [Docket #587].

24.    Michael Marcello further admitted that the Chicago Outfit operated its illegal gambling business under the guise of M & M Amusement, Inc. a vending company that provided vending machine services to local restaurants, bars, taverns and clubs.  *Id.*

25.    On November 19, 2003, Wanderling approached an agent who was executing a search warrant at M & M Amusement, located at 5533 W. 25th Street, in Cicero, Illinois.  At that time, Wanderling identified himself as the attorney for M & M Amusement, and asked for a copy of the search warrant.

26.    Finally, public records accessible on the Attorney Registration and Disciplinary Commission's website indicate that attorneys Salerno and Wanderling share the same business address and share the same telephone number.[3]

---

[3]    The government is unaware of any formal partnership arrangement between Salerno and Wanderling.  However, their use of the same location for conducting their practice and their representation of two defendants with potentially adverse interests should not be overlooked.

## RELIEF REQUESTED

27.    By this Motion, the government respectfully requests that the Court enter an order disqualifying attorneys Alexander Salerno and Edmund Wanderling from ongoing participation in this case.

## BASIS FOR RELIEF

I.    **Applicable Law**

A.    **In the Interest of Ensuring Effective Counsel, District Courts Enjoy Substantial Latitude to Reject Conflict Waivers.**

28.    The Sixth Amendment to the United States Constitution guarantees that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." This guarantee contemplates both the right to retain counsel of one's own choosing and the right to employ counsel free of conflicting loyalties. *Wheat v. United States*, 486 U.S. 153, 159 (1988); *Cuyler v. Sullivan*, 446 U.S. 335 (1980) (defendant is entitled to representation by attorney completely loyal to defendant's cause and unfettered by conflicts); *United States v. Schwarz*, 283 F.3d 76, 90 (2d Cir. 2002) (defendant's "Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel") (citations omitted).

29.    As the Supreme Court has explained, "[j]oint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing. . . . [A] conflict may . . . prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the

11

culpability of one by emphasizing that of another." *Wheat*, 486 U.S. at 160 (quoting *Holloway v. Arkansas*, 435 U.S. 475, 489-90 (1978)).

30.    Accordingly, while the right to be represented by an attorney of one's choosing is contemplated by the Sixth Amendment, that right bows to the principle that the defendant have an effective advocate for his cause. *Wheat*, 486 U.S. at 159. *Accord United States v. Spears*, 965 F.2d 262, 276 (7th Cir. 1992) (district court may reject defendant's waiver of right to conflict-free counsel in interest of ensuring defendant has effective advocate). In other words, the right to effective counsel whose loyalty is undivided is so paramount "that it must in some cases take precedence over all other considerations, including the expressed preference of the defendant[] . . . and [his] attorney." *United States v. Lawriw*, 568 F.2d 98, 105 n.12 (8th Cir. 1977).

31.    Even if a defendant does not object to being represented by counsel with a potential or actual conflict, and executes a waiver of his right to conflict-free representation, such a waiver may be rejected, because it does not foreclose the possibility that an actual conflict could adversely affect counsel's performance in violation of the Sixth Amendment. *Wheat*, 486 U.S. at 161-62; *Doherty v. United States*, 948 F. Supp. 111, 117 (D. Mass. 1996). *Accord Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). In deciding whether or not to accept a waiver of a conflict, a district court is granted "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat*, 486

12

U.S. at 163.  This is so because it is notoriously difficult to determine whether a potential

conflict will become manifest during the course of a case.  *Id.* at 162-63.

        32.     The Seventh Circuit applied these principles in *United States v. Algee*,

309 F.3d 1011 (7th Cir. 2002).  In *Algee*, a defense attorney, Christenson, entered his

appearance for the defendant, Algee, as well as co-defendant Battles on state criminal

charges.  *Id.* at 1012.  Thereafter, attorney Christenson entered an appearance for a third

co-defendant, Gates, and moved to withdraw as counsel for Battles.  *Id.*  The defense attorney

was subsequently disqualified from further participation in the state proceedings.  *Id.* at

1012-13.  After the state convictions were reversed on appeal on other grounds, federal

charges were brought against Algee and Battles that related to the same circumstances that

gave rise to the state charges.  *Id.* at 1013.

        33.     Algee hired attorney Christenson to represent him on the federal

charges.  *Id.*  The government moved to disqualify Christenson based on his prior

representation of Battles and Gates in the state proceedings, and because Christenson had

testified as a defense witness in Algee's state court case.  *Id.*  In support of its motion, the

government noted that (i) Gates (Christenson's former client) had given a statement

implicating Algee, and was expected to testify against him; and (ii) Battles had given a taped

statement.  *Id.*  Subsequently, the government also advised the Court that Christenson had

received cocaine from Algee in return for legal services, and that Christenson represented

another government witness.  Moreover, co-defendant Battles filed his own motion to

disqualify Christenson.  *Id.*

34.     The Seventh Circuit upheld the district court's decision to disqualify Christenson.  *Id.* at 1013-14.  The Seventh Circuit reiterated that a district court is entitled to "substantial latitude" in refusing to waive any conflict of interest, and noted that its review was for abuse of discretion.  *Id.*  The Seventh Circuit noted that the circumstances of *Algee* were similar to *Wheat*, in that Christenson had previously represented Battles, a co-defendant charged in the same criminal conspiracy, and Gates, who was expected to be a government witness.  *Id.* at 1014.  Christenson was also representing another potential government witness.  *Id.*  On these facts, the Seventh Circuit concluded that Battles and Gates would be principal government witnesses, and Christenson would be precluded by ethical rules from cross-examining them in any meaningful way.  *Id.*  Moreover, the Seventh Circuit pointed out that Battles joined in the motion to disqualify Christenson, whereas in *Wheat*, the co-defendants were willing to waive their rights to conflict-free counsel.  *Id.* (citing *Wheat*, 486 U.S. at 156; *United States v. O'Malley*, 786 F.2d 786, 792 (7th Cir. 1986) (in deciding to disqualify defendant's chosen attorney, district court properly considered interests of the attorney's former client, who was also a key government witness, where the client had made it clear that he viewed the risk of an intrusion upon his attorney-client privilege as substantial)).

**B.     The Rules of Professional Conduct Also Provide for Conflict-Free Counsel.**

35.     The loyalty and confidentiality provisions of the Illinois Rules of Professional Conduct and the Local Rules of this Court, both of which apply to defense counsel, materially limit an attorney's ability to represent multiple individuals with

overlapping interests and also limit counsels' ability to represent clients whose interests are adverse to former clients.

36.    Specifically, Rule 1.6(a) of the Illinois Rules of Professional Conduct and Local Rule 83.51.6 provide that attorneys "shall not, during or after termination of the professional relationship with the client, use or reveal a confidence or secret of the client known to the lawyer unless the client consents after disclosure."  This duty has particular relevance in cases where former clients may potentially be trial witnesses subject to cross-examination.  *See generally United States v. Moscony*, 927 F.2d 742, 749 (3d Cir. 1991) (conflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encounters divided loyalties).

37.    Further, Rule 1.7(a) of the Illinois Rules of Professional Conduct and Local Rule 83.51.7(a) provide that an attorney shall not represent a client if that representation is directly adverse to another client, unless "the lawyer reasonably believes the representation will not adversely affect the relationship with the other client" and each client consents after disclosure.

38.    Moreover, Rule 1.7(b) of the Illinois Rules of Professional Conduct and Local Rule 83.51.7(b) provide that an attorney shall not represent a client where the representation may be materially limited by the attorney's responsibilities "to another client or to a third person," unless the attorney reasonably believes "the representation will not be adversely affected," and the client consents after disclosure.

39.    Finally, an attorney "who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter

15

in which that person's interests are materially adverse to the interests of the former client, unless the former client consents after disclosure." Illinois Rules of Prof'l Conduct 1.9; L.R. 83.51.9.

### C. The Federal Courts Have an Independent Duty to Refuse Conflict Waivers Where they Will Compromise the Integrity of the Judicial Process.

40.     The federal courts also have an independent duty to ensure that criminal proceedings are conducted in a manner consistent with both the rules of professional responsibility and the Sixth Amendment, not only to ensure the fair administration of justice, but also to preserve their judgments against subsequent attack on appeal. *Wheat*, 486 U.S. at 160-61.[4] Because of these considerations, and because the integrity of the administration of justice remains paramount, as discussed above, a court's duty to assess conflicts issues persists even in situations where a defendant is prepared to waive any conflict. *Algee*, 309 F.3d at 1013-14 (citing *Wheat*, 486 U.S. 153).

---

[4] When a defendant is represented by an attorney who labors under an actual conflict of interest, reversible error occurs where "adverse impact" to the defendant can be shown. *Enoch v. Gramley*, 70 F.3d 1490, 1496 (7th Cir. 1995); *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991) ("Legal representation which is adversely affected by actual conflicts of interest is never considered harmless error."). The defendant need not show prejudice, merely "conduct by the attorney contrary to the defendant's interests caused by the attorney's conflict." *Enoch*, 70 F.3d at 1496.

II.    **Attorneys Salerno and Wanderling Should Be Disqualified Due to the Actual and Potential Conflicts in this Case.**

41.    As discussed below, a series of situations present themselves that place defense counsel in the midst of actual and potential conflicts.  The following actual and potential conflicts are apparent at this point in time, and others may arise as this case progresses.

A.    **Salerno and Wanderling Have a Conflict Concerning a Prior Client, CW4, Who Is Expected to Testify in this Case and They Will Not Receive a Waiver From that Client.**

42.    As noted above, both Salerno and Wanderling previously represented CW4 in criminal matters.  The facts and circumstances of CW4's prior criminal conduct is expected to be encompassed within additional charges that will be brought against both defendants.  It is also expected that CW4 will testify against Polchan and Volpendesto, both about the current charges lodged against them and as to other matters, including the robbery that was the subject of Salerno's former representation of CW4.  Accordingly, the present case falls within the rubric of Rule 1.9 of the Illinois Rules of Professional Conduct and Local Rule 83.51.9, because it is a substantially related matter in which the interests of CW4 are materially adverse to both Polchan and Volpendesto.  Moreover, CW4 will not waive this conflict.  Salerno and Wanderling therefore cannot continue to represent Polchan and Volpendesto without violating their duty of loyalty to CW4 and Rule 1.9(a)(1) of the Illinois Rules of Professional Conduct.

43.    In addition to constituting a breach of their duty of loyalty to a former client, such successive representation gives rise to the possible breach of Rule 1.6 of the

Illinois Rules of Professional Conduct and Local Rule 83.51.6, namely, the duty to preserve client confidences. As other courts have recognized, any effort to engage in the cross-examination of a former client creates doubts concerning the integrity of the judicial process and raises concerns about whether an attorney has made use of information obtained from representation of a former client. *See United States v. James*, 708 F.2d 40, 45 (2d Cir. 1983) ("allowing an attorney to represent a client in a situation where he may use information obtained in the course of former representation of the client's adversary gives the client an 'unfair advantage.'") (citations omitted); *United States v. Ring*, 878 F. Supp. 134, 139 (C.D. Ill. 1995) (where government argued that, because defense counsel possessed information about government witness who he previously represented, defendant would have an unfair advantage, court granted government's motion to disqualify counsel).

44.    It is not satisfactory to say that no confidences will be betrayed by counsels' successive representation of the defendants after their representation of CW4. A number of courts, notwithstanding claims that no privilege has been violated, have presumed that an advocate gains access to privileged facts by virtue of his representation of a party, on the theory that the court cannot adequately "inquire about the matter without thereby [itself] destroying the confidence." *United States v. Provenzano*, 620 F.2d 985, 1004-05 (3d Cir. 1980). *Accord Moscony*, 927 F.2d at 750 (conflicts of interest arise whenever an attorney's loyalties are divided and an attorney who cross-examines former clients inherently encounters divided loyalties) (citations omitted). The Seventh Circuit has also suggested that such a presumption of access to privileged information is appropriate. The Court made this observation in *Analytica, Inc. v. NPD Research*, 708 F.2d 1263, 1268-69 (7th Cir. 1983):

18

> [C]onducting a factual inquiry in every case into whether confidences
> had actually been revealed would not be a satisfactory alternative . . . .
> Apart from the difficulty of taking evidence on the question without
> compromising the confidences themselves, the only witnesses would be
> the very lawyers whose firm was sought to be disqualified . . ., and their
> interest not only in retaining a client but in denying a serious breach of
> professional ethics might outweigh any felt obligation to "come clean."

45.    Salerno's and Wanderling's prior representation of CW4 therefore

provides ample grounds for the disqualification of both attorneys.

**B.    Salerno Has Previously Represented Volpendesto, and Therefore is Incapable of Offering Impartial Advice to Polchan On Several Matters Critical to His Representation.**

46.    Additional grounds exist to disqualify attorney Salerno.  Prior to

indictment, Salerno represented Volpendesto during the government's investigation.

Salerno's duty of loyalty to his former client[5] means that Salerno cannot offer impartial advice

to Polchan on several critical issues:

a    <u>The Decision Whether to Cooperate</u>. Salerno is unable to render

conflict-free advice to Polchan concerning any possible cooperation with the government.  For

example, Salerno cannot advise Polchan to cooperate against Volpendesto without breaching

---

[5]    The government assumes for purposes of this motion that Salerno has terminated his attorney-client relationship with Volpendesto; however, that is not entirely clear from the facts known to the government to date.  In the event Salerno has not done so, then additional issues would arise from his efforts to simultaneously represent both Polchan and Volpendesto.  For example, Rule 44(c)(2) of the Federal Rules of Criminal Procedure requires a district court to promptly inquire about joint representation, and advise each defendant "of the right to the effective assistance of counsel, including separate representation."  Moreover, "[u]nless there is good cause to believe that no conflict of interest is likely to arise, the court must take appropriate measures to protect each defendant's right to counsel."  Fed. R. Crim. P. 44(c)(2).

his duty of loyalty to Volpendesto.  In the process, Polchan is denied a candid assessment of the value of cooperating with the government.

        b     <u>Limitation on Defense Theories</u>.  Polchan's theory of defense at trial will be hampered by the fact that Salerno cannot pursue a theory of defense implicating his former client, Volpendesto.  Nor can Salerno respond to a defense theory from Volpendesto that implicates Polchan without violating his duty of loyalty to Volpendesto.  In short, Salerno will be unable to provide effective representation to Polchan.

        c     <u>Inability to Cross-Examine</u>.  If Volpendesto wishes to testify, Volpendesto could, by his testimony, implicate Polchan in the bombing of C & S.  Salerno will be unable to effectively represent Polchan when faced with this incriminating testimony without violating his duty of loyalty to Volpendesto.

        d     <u>Sentencing Conflicts</u>.  To the extent either defendant is convicted and seeks eligibility for "safety valve" relief under Guideline 5C1.2, Salerno will be unable to represent to the Court that Polchan has given a full and truthful account of the defendant's offense conduct and relevant conduct if such account further implicates Volpendesto.  Salerno also will not be able to argue the relative culpability of Polchan at sentencing if in order to do so, he would have to suggest his former client had greater culpability.

        e     <u>Breach of Duty of Confidentiality</u>.  During his pre-indictment representation of Volpendesto, Salerno may have acquired details concerning the charged offenses that would assist in his defense of Polchan.  However, such information could not be used without violating Salerno's duty of confidentiality to Volpendesto under Rule 1.6 of the Illinois Rules of Professional Conduct and Local Rule 83.51.6.

**C.   Salerno Has Provided Representation to Outfit Member A as Recently as Several Weeks Ago, and Therefore is Incapable of Offering Impartial Advice to Polchan On Matters Critical to His Representation, Including Any Decision to Cooperate Against Outfit Member A.**

47.    As noted above, on the day Polchan was arrested, and one day before he made his initial appearance, Salerno provided legal representation to Outfit Member A. *See supra* ¶15.  Moreover, as noted above, Outfit Member A has previously identified Salerno and Wanderling as his attorneys when approached by federal law enforcement.  *See supra* ¶19.  It is apparent that Salerno maintains an on-going relationship with Outfit Member A that extends to Salerno's provision of legal services and legal advice to Outfit Member A. And yet, at the very same time, Salerno also represents Polchan, an individual that possesses information concerning the criminal activities of Outfit Member A relevant to the instant case.

48.    Salerno is in no position to provide impartial advice to Polchan concerning his options going forward.  Polchan faces a mandatory minimum sentence of 35 years imprisonment on the charged offenses, and the evidence against him is substantial.[6]

---

[6]    As Magistrate Judge Valdez concluded after reviewing a portion of the government's evidence against Polchan at his detention hearing:

> Based on the government's proffer and audio evidence, the evidence against Volpendesto is strong.  The evidence against Polchan is derived from the implicit acknowledgment of Volpendesto that Polchan was the other person present at the bombing and by the statements of CW4 and Kyle Knight.  The government has proffered enough evidence, which was substantially unrebutted at the hearing, that Polchan's association with the Outfit exists. Overall, the statements implicating Polchan are substantial evidence of Polchan's involvement [in the bombing]."

*United States v. Polchan*, No. 08 CR 115, op. at 6 (N.D. Ill. Aug. 8, 2008) [Docket #17] .

21

Under these circumstances, Salerno cannot provide Polchan with an impartial and candid assessment of his options, including advice about whether Polchan should cooperate with the government against Outfit Member A.[7]  Salerno's representation of Polchan is materially limited by his responsibilities to another client, and it is unreasonable to believe otherwise. *See* Illinois Rules of Prof'l Conduct 1.7(b); Local Rule 83.51.7(b).[8]

49.    Moreover, the commentary to Local Rule 83.51.7 precludes obtaining a waiver from Polchan under these circumstances.  The commentary provides that "when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, *the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent*."  L. R. 83.51.7 (Committee Comment, "Disclosure and Consent") (emphasis added).

## CONCLUSION

50.    This case bears many similarities to other situations where disqualification has been ordered.  As in *Algee*, Salerno and Wanderling have previously

---

[7]    Salerno's association with Outfit Member A may also preclude Polchan from seeking out candid advice from Salerno about the prospect of cooperating with the government.  For example, during a portion of CW4's cooperation with the government, CW4 was represented by Salerno on state charges.  CW4 asked federal law enforcement agents not to inform Salerno of his cooperation with the federal government, due to concern that such information would be provided to Polchan and Outfit Member A.  Polchan may share the same perception as CW4.

[8]    Similar concerns apply to Wanderling and his representation of Volpendesto.  Outfit Member A has previously identified Wanderling, who shares office space with Salerno, as his attorney.  Wanderling currently represents another Outfit defendant, has prior associations with several Outfit-controlled businesses, and appears to have other legal associations and/or business dealings with Outfit Member A which the government submits should be fully disclosed and vetted by the Court.  Indeed, both attorneys should be required to disclose, if they persist in seeking to represent the defendants, any other legal, non-legal or social relationship with Outfit Member A.

represented a prospective government witness, CW4. Indeed, Salerno's prior representation of CW4 extends to conduct that will be the subject of additional charges against the defendants. Additional actual and potential conflicts exist owing to Salerno's prior representation of Volpendesto and both attorneys' associations with Outfit Member A. Finally, as in *Algee*, CW4 has indicated that he will not consent to Salerno's and Wanderling's attempt to successively represent the defendants in this case. *See also O'Malley*, 786 F.2d at 792.

51. Finally, the potential harm to the integrity of the judicial process resulting from Salerno's and Wanderling's continued representation of the defendants is apparent. As noted above, this Court has an independent interest in ensuring the integrity of the judicial process, and that "legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160. Because of the defendants' ties to organized crime and the Chicago Outfit, this case has already attracted considerable public attention. In order to preserve the perceived fairness and integrity of the judicial process, the government submits that this Court should not permit defense attorneys – who have a variety of associations with a high-ranking member of the Chicago Outfit – to provide legal advice to defendants who need impartial advice on all their options, including whether to cooperate against that criminal figure. This Court should act to relieve defense counsel of the multiple conflicts they face in this case. The motion should be granted.[9]

---

[9] The government has conferred with defense counsel concerning discovery in this case, and has advised counsel that the government will defer the production of discovery in this case until after this Court has ruled on this motion.

23

WHEREFORE, the government respectfully requests that the Court enter an order (i) granting the motion; and (ii) granting such other and further relief as may be just and proper.

Dated:       Chicago, Illinois
              August 18, 2008


Respectfully submitted.

PATRICK J. FITZGERALD
United States Attorney


By:   /s/ Amarjeet S. Bhachu   6236711
      T. MARKUS FUNK
      AMARJEET S. BHACHU
      Assistant United States Attorneys
      219 South Dearborn Street
      Fifth Floor
      Chicago, Illinois 60604
      (312) 469-6212

## CERTIFICATE OF SERVICE

Amarjeet S. Bhachu, an Assistant United States Attorney assigned to the instant matter, hereby certifies that the attached GOVERNMENT'S MOTION SEEKING DISQUALIFICATION OF DEFENSE COUNSEL DUE TO CONFLICTS PRESENTED BY THEIR REPRESENTATION OF THE DEFENDANTS was served on August 18, 2008, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Amarjeet S. Bhachu    6236711
AMARJEET S. BHACHU
Assistant United States Attorney
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604